The State of Ohio, Appellee, *v.* Gerhardt, Appellant.

(No. 231—Decided November 9, 1961.)

*Mr. Warren F. Sheets*, prosecuting attorney, for appellee.
*Mr. Richard C. Gerhardt, in propria persona.*

BROWN, J.   Appellant was indicted by the Grand Jury of
Gallia County, Ohio, on June 14, 1960, together with Edward
Earl Isaac and George Paul Isaac, under an indictment charg-
ing them with possession of burglary tools, contrary to Section
2907.11, Revised Code.   On arraignment appellant entered a
plea of not guilty and on September 14, 1960, was tried before a
jury, found guilty and sentenced to a term in the Ohio Peniten-
tiary.   He was tried separately from the other codefendants, in
as much as they previously had been extradited to Kentucky.

A motion for new trial was filed, and upon the denial thereof
on September 26, 1960, this appeal was taken.   Although the
notice of appeal stated that the appeal was on questions of law
and fact, we must consider the same as a review of a judgment
of conviction or final order of the Common Pleas Court in con-
viction of a felony pursuant to Sections 2953.02 and 2953.04 of
the Revised Code.

The appellant was represented by counsel in the trial court,
who filed a notice of appeal, a brief and assignments of error
on behalf of appellant.   Thereafter, apparently, the attorney
was    discharged    by    the    appellant.    Appellant    appeared
at the hearing on the appeal and argued in his own behalf and
represented to the court that the counsel of record did not rep-
resent him on the appeal.   Prior thereto, appellant, represent-
ing himself, filed several documents in these proceedings for
the court's consideration.   These were entitled motion for or-
der of demurrer, motion to suspend sentence, motion for order
of mandamus, motion to ascertain jurisdiction in the Court of
Common Pleas of Gallia County, and motion for separate find-
ings of fact and separate conclusions of law.   We have examined
the above motions and authorities cited thereunder and find that
they are not well taken as a part of this appeal, and they are,
accordingly, overruled.

The evidence reveals that on May 31, 1960, Sergeant G.
M. Scott of the West Virginia State Police at Point Pleasant,
West Virginia, received a teletype memorandum from the

Charleston, West Virginia, State Police Office, which reads as follows:

"B-1845 File 13 SP Charleston, W. Va. May 31-60 SP and PD Parkersburg, W. Va., SP Pt. Pleasant, W. Va. and SP Beckley, W. Va. ATTN. Cpl. Neely Reliable information has been submitted this detachment, that two known safe men who has previously pulled jobs this area, left Newport News, Ky. this date, with the intentions of pulling a safe job either tonight or tomorrow night, within a 200 mile radius of Cincinnati, Ohio, and returning there after job. NR I John Paul Isaacs and NR 2 William Conrad Gerhardt driving a 1960 Mercury two-door, light tan almost white, bearing Ky. Reg. 547 955 and carrying complete burglary outfit. These subjects have previously hit the Kroger Store at Belle, W. Va., Flowers Super Market in Charleston, W. Va., and Sears Roebuck in Huntington, W. Va. Auth SP Charleston, W. Va. Sgt. Price Dickson 1716"

This information in this memorandum was relayed by Sgt. Scott to the Point Pleasant, West Virginia, City Police Department, the Sheriff of Gallia County, Ohio, and the Gallipolis City Police Department. Point Pleasant, West Virginia, is located just across the Ohio River, slightly east and within 4 miles of Gallipolis, Ohio. Shortly after receipt of this memorandum, a car answering this description and bearing the reported license number was first noticed by Officer Jividen of the Point Pleasant police parked on Viand Street in Point Pleasant. Jividen watched the car for a short time, returned to his office for instructions, and when he returned it had disappeared. At about 9 that evening, James Saunders, a Gallipolis, Ohio, police officer, noticed the car bearing the teletyped description driving on Eastern Avenue in Gallipolis, and pursued and stopped it at Locust and Second Streets, Gallipolis. In the car were three persons who were later identified as Edward Earl Isaac, George Paul Isaac and appellant. Edward Earl Isaac was the driver and the appellant was riding in the right front seat. Edward Isaac, at the time the car was stopped, told the officer his name was James Morton, and that he was the owner of the car, and he produced registration papers in the name of James Morton. Later it was determined that James Morton was in fact Edward Isaac. The car was taken to the Gallipolis City Building where the defendants were booked. A search of the automobile re-

vealed a suitcase in the locked trunk in which were found numerous tools which were identified as burglary tools.

Appellant denied any knowledge of these burglary tools, denied any intention of committing a burglary, or using the tools in question for that purpose, and stated that he was a passenger in the car and that the Isaac brothers had offered him a ride to Cleveland, Ohio, where he wanted to pick up some clothes. He and the Isaac brothers had undertaken a most indirect and circuitous route from Newport, Kentucky, to Cleveland, Ohio. Appellant rode with Paul Isaac from Newport to Ludlow, Kentucky, where Edward Isaac was staying, and there picked him up. Thereafter, they returned to Cincinnati, Ohio, drove over U. S. Route 52 to Portsmouth, thence to Oak Hill, and continued on until they hit Route 35, and thence down Route 35 to Gallipolis, where appellant stopped and bought a black polo shirt at Thomas Clothiers to replace a shirt upon which he had spilled chocolate milk on the trip. From Gallipolis, the three went to Pomeroy where Paul Isaac made a telephone call in an attempt to find a friend. Unable to locate the friend, they went to a movie in Pomeroy, Ohio. Then, they drove down Route 7 and across the bridge to Point Pleasant, West Virginia, where Paul Isaac made another telephone call, and thence drove to Gallipolis where they were apprehended. On the original questioning, all three denied they had been in Gallipolis before, but upon discovery of the sales slip for the polo shirt they admitted that they had been there when appellant purchased the same. In this case, as shown above, appellant claimed that he was a mere passenger in the vehicle and had no knowledge of these tools and no intent to use the same burglariously. The tools themselves were identified as burglar tools by an expert witness from the Ohio Bureau of Criminal Identification and Investigation, who stated that "this set of tools is, I believe, as complete and in as good a shape as any I have seen." As to that fact, there appears to have been no controversy in the trial court, and in considering the number, type, nature and probable use of the tools involved, we readily agree with the opinion of the expert in the trial, based on our experience in the trial and review of similar cases in this district.

The indictment in question charged that Richard Conrad Gerhardt, Edward Earl Isaac and George Paul Isaac, on May

31, 1960, in the County of Gallia aforesaid did unlawfully have in their possession certain implements and tools, to wit, sledge hammer, electric drill and bits, steel punches, crow bar, auger and bits, ropes, covered flashlights, bolt cutters, vice grip and numerous other small tools commonly used by burglars for housebreaking, forcing doors, windows, locks or other buildings, or other places where goods, wares, merchandise or money are kept, with the intent then and there of using said tools and implements burglariously.

Appellant lists the following assignments of errors.

1. The court erred in admitting certain evidence prejudicial to this appellant offered by the appellee over the objections of this appellant.

2. The court erred in exercising its discretionary powers during the course of the trial, preventing this appellant from having a fair trial.

3. The court erred in overruling this appellant's motion for a directed verdict at the close of the plaintiff's evidence, and at the close of all the evidence.

4. The court erred in failing to provide this appellant a written copy of its charge prior to final argument, upon timely application therefor.

5. The court erred in its charge to the jury.

6. The verdict and judgment are contrary to law and against the weight of the evidence.

The fourth assignment of error is that the court erred in failing to provide this appellant with a written copy of its charge prior to the final argument upon timely application therefor. The record reveals that during the course of the trial, on September 15, 1960, the attorney for defendant filed a written request that the court reduce its general charge to writing before final argument. The record and bill of exceptions are silent as to whether this request was complied with. In appellee's brief there is a professional statement that the appellee's attorney checked with the trial judge who stated that the general charge was reduced to writing before final argument and accompanied the jury to the jury room.

Section 2945.10 (G) of the Revised Code provides:

"The court, after argument is concluded and before proceeding with other business, shall forthwith charge the jury.

Such charge shall be reduced to writing by the court if either party requests it before the argument to the jury is commenced. Such charge, or other charge or instruction provided for in this section, when so written and given, shall not be orally qualified, modified, or explained to the jury by the court. Written charges and instructions shall be taken by the jury in their retirement and returned with their verdict into court and remain on file with the papers of the case."

The error complained of is for failure to do something which is not required by statute. There is no requirement that the appellant be furnished with a written copy of the judge's charge to the jury. The purpose of Section 2945.10 (G) is to provide for a written charge to be presented to the jury for their use in arriving at a verdict and not for the convenience of counsel. There is also no requirement by law, as appellant asked in his written request, namely, that the court reduce its general charge to writing before final argument. The time of reducing the same to writing is left to the judge's discretion so long as it is completed in time to constitute the charge actually given after proper request has been made. Accordingly, this assignment of error is overruled.

However, we feel it incumbent upon the trial judge when he does reduce a charge to writing upon proper request to make certain that the written charge is included in the record on appeal. This was not done in this case. Otherwise, this court will be unable to determine on review whether the requirement of Section 2945.10 (G) against oral qualifications, modifications or explanations of the same is complied with.

The fifth assignment of error is that the court erred in its charge to the jury. No specific error is relied on. A reading of the charge itself reveals it was comprehensively and adequately given and covered all essential aspects of the case. This error is overruled.

Similarly as to the second, third and sixth specifications of error, a review of the evidence and record reveals no error prejudicial to the appellant, except insofar as they relate to the first assignment of error discussed below.

The first assignment of error is that the court erred in admitting certain evidence offered by the appellee herein over the objections of this appellant. Specifically, this assignment

referred to the admission into evidence of the teletype memorandum set forth above.

Sergeant G. M. Scott of the West Virginia State Police was the first witness called by the state, and his initial testimony relative to the teletype message as shown by the bill of exceptions is as follows:

"9  Q—What do you have in the way of communication? A—We have a radio and a teletype machine.

"10  Q—Who receives the messages from that teletype machine?  A—When I am there, I usually take care of them.

"11  Q—Were you on duty on the evening of May 31, 1960? A—I was.

"12  Q—In your office in the court house in West Virginia? A—I was.

"13  Q—At that time were there any members of your detachment in your office or were they out on duty?  A—They were out at that time.

"14  Q—Did you receive any teletype message pertaining to Gerhardt and the Isaac brothers that evening?  A—I did.

"15  Q—Would you please state to the jury what that message was?

"Mr. Epling:  I object to it as having been hearsay.

"The Court:  Objection overruled.

"Exception.

"Mr. Sheets:  Would you please read back the question?

"Reporter:  Would you please state to the jury what that message was?

"Witness:  A—It was directed to the State Police at Parkersburg, Point Pleasant, and Beckley.  It mentioned the make and model of a car, the license number, and named two subjects who were in the car, known safe men.

"Mr. Sheets:  16  Q—What did you mean known safe men? A—They had pulled robberies or several burglaries before.

"17  Q—Do you have that copy of the teletype message with you?  A—I do.

"18  Q—May I see it?  A—Yes.

"19  Q—Is this the teletype message that you received, you have testified about?  A—Yes.

"20  Q—You can identify it as such?  A—That's right.

"Mr. Sheets:  We now offer this as State Exhibit A and ask that it be accepted.

"Mr. Epling: We object to it as being hearsay.

"The Court: Overruled, the same be received in evidence.

"Exception.

"Mr. Sheets: 21 Q—Sergeant, if you will please, State Exhibit A has been received in evidence, if you would please read that?

"Mr. Epling: I object, your Honor, as it being hearsay and ask the court to strike this testimony from the record.

"The Court: Objection overruled.

"Exception.

"Mr. Sheets: You may read State Exhibit A."

The witness then read Exhibit A, the teletype memorandum to the jury.

On cross-examination, Sergeant Scott testified that the message was typed by Mrs. Dickson of the South Charleston, West Virginia, State Police office. The message itself was signed by a Sergeant Price Dickson. Neither of these individuals appeared as witnesses for the state. The contents of the message were further restated to the jury by the following police officers called by the state.

Sheriff Oscar Baird testified as follows:

"Sgt. Scott told me that there were two known safe crackers headed for this area in a 1960 Mercury that was light tan or almost white in color, bearing a Kentucky license plate. They had burglary tools in the car and their intentions were to burglarize some place in this area from Newport, Kentucky, to around Cincinnati, Ohio, and return to Newport the next morning. He said the fellows' names were Gerhardt and Isaac in the car."

Officer Saunders of the Gallipolis Police Department testified as follows:

"Q—Did you receive any message from headquarters to be on the lookout for any particular type car? A—I did.

"Q—Would you state what that message was? A—To be on the lookout for a 1960 Mercury sedan, color—tan, or almost white, bearing Kentucky license 547-955. They also said there were possibly three subjects in this car and that they had the report that they were carrying burglary tools."

Officer Paul North testified as follows:

"Q—Did you receive any message to be on the lookout for a particular automobile? A—Yes, previous to that.

"Q—What was that message? A—To be on the lookout for a 1960 Mercury, Kentucky license 547-955, light tan, almost white in color. Also, that the car was in this area, and they had burglary tools in their possession."

Sergeant John Taylor testified as follows:

"Q—Will you please read what appears there in regard to a certain automobile, a 1960 Mercury, and the message?

"Objection.

"Overruled.

"Exception.

"A—At 8:45 P. M., Tuesday, May 31, 1960, I received a message by telephone from Sheriff Oscar Baird. This message stated that he received information from the West Virginia State Police that two safecrackers left this P. M. possibly to pull a safe job in this area and will return to Newport, Kentucky, again the next morning. They have got several burglary tools in the car and are driving a 1960 Mercury, light tan, almost white in color, bearing a Kentucky registration 547-955. That's the message I received from Sheriff Baird which I relayed to the other cars."

It is apparent from the extensive testimony of the contents of this teletype message by all the officers concerned in the arrest of the appellant and the lack of any other evidence bearing on a joint venture to use the tools with Edward Isaac, alias James Morton, the owner of the car, that the state relied on the message and its contents to prove the possession of tools by the appellant and the intent to use them burglariously necessary to justify a conviction. Otherwise, there is no evidence in the bill of exceptions relating to those elements, other than the circumstance of the automobile trip and the presence of the appellant in the car in which the tools were found. That the state relied on this statement is further shown from the additional testimony of Sergeant Taylor. Taylor, on cross-examination, had been asked by the attorney for the appellant as follows:

"Q—Were there any circumstances to show that some burglary would be committed in this town? A—That would be hard to give a yes or no answer to. I couldn't say that I knew of any definite place that was going to be burglarized."

The next morning, the state on re-direct examination questioned Sergeant Taylor further:

"Q—Prior to the recess yesterday, you were asked this question on cross-examination: 'Were there any circumstances to show that some burglary would be committed in this town?' I believe your answer was that it would be hard to answer yes or no. Did you have anything in your possession or any circumstances that you know about which would lead you to believe that a burglary was to be committed in this area? A—Yes, I did.

"Q—What? A—I had the information from that teletype. That was the information that these subjects were in the car and that they possessed burglary tools and were equipped to commit a burglary. Also, the fact that these subjects were in this town on two different occasions that day."

In order to prove a conviction under Section 2907.11, it is necessary to prove beyond a reasonable doubt appellant's (1) having or keeping in possession (2) tools, implements, or other things (3) used for housebreaking, forcing doors, windows, locks, buildings, or other places where merchandise or money are kept, (4) with the intention of using such tools burglariously, and (5) venue. See 2 Snyder, Ohio Criminal Code, 615.

In this, as in most all prosecutions under Section 2907.11 of the Revised Code, the most difficult problem faced by the state is the difficulty of proving beyond a reasonable doubt the essential element (4) listed above, namely, the intent to use such tools burglariously. A review of the decided cases involving possession of burglary tools indicates that courts have strained to justify verdicts where the evidence of intent to use such tools burglariously was remote and, in some cases, nebulous. It seems to us that if the offense is of great magnitude, and it is, the Legislature should correct the situation by not requiring proof of the difficult element of the crime, namely, intent to use the tools burglariously, and should predicate the offense on the possession of burglar tools alone. We feel certain that the law enforcement officials of Ohio in their judgment would enforce the same only in proper cases and not prosecute at random innocent people who had possession of tools which might be used for the purpose of breaking and entering.

Even though, as in this case, where there is a very real possibility of guilt, and the problem of proof difficult, it is the duty of all concerned with the trial to see that conviction results

only from a proper trial and through the introduction of competent evidence.

As was said in *Neighbours* v. *State*, 121 Ohio St., 525, by Judge Robinson, speaking for the Supreme Court on page 529, "A prosecuting attorney has discharged his full duty to the state when he has presented such competent evidence as he is able to obtain. When in his zeal he attempts to strengthen his case by the introduction of incompetent evidence, or by artifice to convey information to the jury, which he can not convey to it otherwise, he but defeats his own purpose and the purpose of the state which he represents, for it is not, and must not be, the purpose of the state to convict an accused upon other than competent evidence, nor by artifice to deny him a fair trial."

The memorandum and the frequent referrals to it by the police officers constitute all the evidence on the subject of appellant's intent to use these tools burglariously. The other defendants were not called as witnesses by either side, nor were the purported authors of the message before the court. There were no admissions, confessions, statements or other probative evidence relating to the subject of the appellant's intent, other than the teletype message. We deem the introduction of the teletype memorandum into evidence and the testimony regarding its contents as prejudicial to the appellant and in violation of his constitutional rights. It and its contents are, of course, hearsay and not subject to any of the exceptions to the hearsay rule.

Appellee claims that the teletype message was not admitted for its truth or falsity but was admitted for the purpose of showing and giving rise to the actions of Sergeant Scott in putting out the information he did concerning the appellant and two other subjects. If this were so, why was it necessary to have the message read to the jury by Sergeant Scott and then have the contents of the message explained to the jury by Sheriff Baird, Officer Saunders, Officer North and Sergeant Taylor; in fact all the state's witnesses giving evidence as to the actual commission of the alleged crime? The actions of Sergeant Scott in putting out the teletype message in West Virginia were not relevant to the elements of a crime alleged to have been committed in Ohio later.

Historically, it has been fundamental in Anglo-Saxon juris-

prudence that a person accused of crime be accorded the right of confrontation of witnesses who testify against him, and the right to cross-examine them after they have been properly placed under the sanctity of the sworn oath. These rights are incorporated in the Ohio Constitution in Section 10 of Article I. It provides among other things:

"* * * In any trial, in any court, the party accused shall be allowed to appear and defend in person and with counsel; to demand the nature and cause of the accusation against him, and to have a copy thereof; to meet the witnesses face to face, and to have compulsory process to procure the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county in which the offense is alleged to have been committed; but provision may be made by law for the taking of the deposition by the accused or by the state, to be used for or against the accused, of any witness whose attendance can not be had at the trial, always securing to the accused means and the opportunity to be present in person and with counsel at the taking of such deposition, and to examine the witness face to face as fully and in the same manner as if in court. * * *"

In the case of *Summons* v. *State*, 5 Ohio St., 325, it is held that:

"The clause of the tenth section of the bill of rights, providing that, '*on any trial in any court, the party accused shall be allowed to meet the witnesses face to face,*' which, like numerous other provisions in the bill of rights, is a constitutional guaranty of a fundamental principle well established and long recognized at common law, has reference to the *personal presence* of the witnesses called to testify, and not the *quality* or *competency* of the evidence to be given."

And the judge delivering the opinion, at page 340 said:

"The scope and operation of it are clearly defined and well understood, in the common-law recognition of it; and the assertion of it in the fundamental law of the state, was designed neither to enlarge nor curtail it in its operation, but to give it permanency, and secure it against the power of change or innovation."

This constitutional guaranty is now and always has been the sacred right of anyone charged with a crime, and in no case can it be invaded or taken away. In such case the accused is

entitled to "meet the witnesses face to face" and to have an opportunity to cross-examine such witness or witnesses, and in addition the accused likewise has the right to test the qualifications of a witness before testifying, when his competency as a witness is questioned in good faith.

Appellee relies on Section 2945.83 of the Revised Code which states:

"No Motion for a new trial shall be granted or a verdict set aside, nor shall any judgment of conviction be reversed in any court because of:

" * * *

"(C) The admission or rejection of any evidence offered against or for the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby;

" * * *

"(E) Any other cause unless it appears affirmatively from the record that the accused was prejudiced thereby or was prevented from having a fair trial."

"The rule that the erroneous admission of evidence constitutes reversible error where it is prejudicial to the accused, but is not ground for reversal otherwise, has been applied in a variety of situations in criminal cases, including the admitting into evidence of * * * statements or opinions by third parties not sworn as witnesses, made in the absence of the defendant, and without proof of conspiracy between such third person and the defendant; * * * hearsay evidence; * * *." 4 Ohio Jurisprudence (2d), 94, Section 877, and cases cited thereunder.

We hold that the introduction of the teletype memorandum and its contents into evidence was prejudicial to the appellant. The right of the appellant as a person accused to meet the witnesses against him face to face is a constitutional right and neither the Legislature nor the courts can deprive a person of that right.

The judgment and conviction will be reversed, the verdict of the jury set aside, and the cause remanded to the Court of Common Pleas for further proceedings according to law.

*Judgment reversed and cause remanded.*

RADCLIFF, P. J., and COLLIER, J., concur.